Filed 5/21/21  P. v. Brown CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089252 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE017680) |
| v. | |
| MARKEES BROWN, | |
| Defendant and Appellant. | |

This case arises out of a drive-by shooting in a residential neighborhood in north Sacramento.  A jury found defendant Markees Brown guilty of three counts of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a)),[1] one count of discharging a firearm at an inhabited dwelling (§ 246), three counts of assault with a semiautomatic firearm (§ 245, subd. (b)), three counts of discharging a firearm

---

[1]  Undesignated statutory references are to the Penal Code.

1

from a motor vehicle at another person (§ 26100, subd. (c)), and one count of being a felon in possession of a firearm (§ 29800, subd. (a)(1)). The jury also found true the firearm enhancement allegations. (§§ 12022.5, subds. (a), (d), 12022.53, subds. (b), (c).) In a bifurcated proceeding, the trial court found true the allegations that defendant had served four prior prison terms (§ 667.5, subd. (b)) and had three prior serious felony convictions (§ 667, subd. (a)) that qualified as strikes under the three strikes law (§§ 667, subds. (e)(2), 1170.12, subd. (c)(2)). The trial court sentenced him to an aggregate term of 258 years to life in prison. He timely appealed.

Defendant contends the judgment must be reversed for numerous reasons, including insufficient evidence, instructional error, prosecutorial misconduct, ineffective assistance of counsel, sentencing error, and cumulative error. Defendant further contends, and the People concede, that the four prior prison term enhancements (§ 667.5, subd. (b)) must be stricken pursuant to Senate Bill No. 136 (2019-2020 Reg. Sess.). Finally, defendant contends that section 3051, subdivision (h) violates equal protection principles because it excludes otherwise eligible offenders from receiving a youth offender parole hearing if the offender was sentenced under the three strikes law. We reverse one of the attempted murder convictions and remand for further proceedings consistent with this opinion. In all other respects, we affirm the judgment.

**FACTUAL BACKGROUND**

The drive-by shooting in this case occurred following several altercations involving two families from the same neighborhood. We do not attempt to recite all the evidence adduced at trial. Nor do we attempt to resolve the inconsistencies and conflicts in the evidence. Instead, we summarize the relevant facts in the light most favorable to the judgment (*People v. Maury* (2003) 30 Cal.4th 342, 396, 403 [it is the jury's role to resolve the inconsistencies and conflicts in the evidence]), and add facts throughout the Discussion section where necessary to discuss the issues raised on appeal.

2

*The Families*

In 2017 N.J. (mother) and her boyfriend K.H. (boyfriend) lived in the Strawberry Manor neighborhood in north Sacramento. Mother had eight children, including S., T., and Z. (collectively, Sac. girls or Sac. family, when referring to the entire family).

The family home (hereafter duplex) was a converted duplex with two separate side-by-side attached garages in the front. From the viewpoint of the street, the garages are known as the "left garage" and "right garage." The front door of the duplex, which opens into the living room, is next to the left garage (i.e., to the left of the left garage). Directly outside the front door of the duplex is a small porch area and beyond that a lawn. The driveway and garages are to the right of that lawn area. The street is approximately 25 feet from the garages, which are slightly elevated from the street.

The Sac girls did not get along with a group of teenage girls that lived in their neighborhood, known as the "Manor Mob girls" or "Manor girls" (collectively, Manor girls). The Manor girls included defendant's girlfriend A.B., and her three sisters.

The issues between the two groups of girls (e.g., arguing or "bickering") began in or around 2010 when mother's oldest daughters, S. (then aged 16) and T. (then aged 14), were in high school. According to T., the issues with the Manor girls "most likely" started because of a dispute over a guy.

At all relevant times, S. and T. were in their early 20s while Z. was 12 or 13 years old. The record does not disclose the ages of the Manor girls. Defendant was in his early 20s.

*The Altercations Prior to the Shooting*

On April 3, 2017, mother, boyfriend, T., and several other members of their extended family went to the Parlare nightclub in downtown Sacramento. One of the Manor girls and others associated with the Manor girls also went to Parlare that night. As the two groups were leaving the club around 2:00 a.m., there was an exchange of words followed by a fight involving 10 to 15 females.

3

Around 4:00 a.m. that same morning, there was a "big boom" outside the duplex followed by a female voice saying, "Tell them bitches to come outside. They jump my mom and I'm gonna MF – fuck they and whoop de whoop de whoop." When mother and T. looked outside, they saw several of the Manor girls, their grandmother, and defendant. The group was yelling, "You bitches come outside." At one point, a male said, "[F]uck that, let's just run up in them bitches' house[]."

Thereafter, boyfriend went outside with a knife to protect his house. When boyfriend approached the group and said, "What's up?," defendant started laughing and pointed a black handgun at him, which appeared to be a .40 or .45 caliber gun. In response, boyfriend raised both his hands and said, "[O]kay[,] I see you." He then turned around and went back inside without incident. A bottle of Hennessy was thrown through the living room window and boyfriend called 911.

Police officers arrived at the duplex around 4:50 a.m. and observed approximately 15 females in the street arguing. One group of females was walking away from a second group of females that was headed inside the duplex. Because nobody at the duplex wanted to press charges for the broken window, the officers left the area without further investigation into the incident.

Around 12 hours later, the Manor girls returned to the duplex accompanied by a group of approximately 30 people. There were about 25 females and five males, including defendant. The group threatened to kick down the door if mother did not allow her daughters and nieces to come outside and fight. Over the course of this incident, which lasted three to four hours, the group kicked mother's dog, swore at her 14-year-old daughter, and threatened to force mother and her family outside. Defendant, who was holding a gun, demanded that the people inside the duplex come outside but mother did not allow it.

Boyfriend called 911 twice during this incident. Both calls were recorded and played for the jury. In the second call, which was placed at 6:41 p.m., boyfriend reported

4

that a 19- or 20-year-old light-skinned black man with dreads was in the front of his house holding a gun. The group outside the duplex left the area when the police arrived.

Two days later, the Manor girls returned to the duplex and threatened to "run in the house" and "jump" on mother if she did not allow her daughters to come outside and fight. The Manor girls were accompanied by at least 40 females and a few males, including defendant. S., T., and their cousins (10 total) went outside and fought the much larger group using various weapons. The males, including defendant, encouraged and made threats but did not join the fight. Defendant promoted the fight by telling the females on his side to "get[] them bitches." Mother eventually called 911 and the fighting stopped when the police arrived.

Following this incident, boyfriend, who regularly hung out in his front yard, saw defendant drive by the duplex daily in a black Crown Victoria. The two men never exchanged words. On two occasions, boyfriend saw defendant stop at the white house indirectly across the street on a corner (hereafter, the white house). According to T., a man named Dwayne lived at the white house with his girlfriend. Dwayne drove a silver four-door Mercedes with tinted windows.

*The Shooting*

Approximately five months after the incidents at the duplex involving the Manor girls and defendant, there was a drive-by shooting at that location. During the preceding five-month period, there were no verbal or physical altercations between the Sac. girls and the Manor girls.

On the day of the shooting, September 11, 2017, there were a number of people at the duplex, including mother, boyfriend, T., S., Z., and S.'s best friend La.N.

Around 7:15 p.m., mother, boyfriend, T., Z., and La.N. were hanging out in front of the duplex when a silver Mercedes with tinted windows parked in front of the white house across the street. At that point, mother went inside the duplex. Thereafter, a light-skinned black man with dreads and a black-hooded sweatshirt or jacket, later identified as

5

defendant, got out of the front passenger seat of the Mercedes. According to Z., as defendant was walking up to the front door of the white house, he stared "hard" in the direction of the duplex, "like he had a problem." Boyfriend started to feel "kinda . . . weird" because defendant kept "looking weird and shit at [his] house." Boyfriend told Z. to go inside and then went inside and told mother that defendant "looked like he was tripping." At the time boyfriend went inside, defendant was getting back into the Mercedes.

T., who had known defendant from the neighborhood for about seven years, saw him knock on the front door of the white house and then look in her direction. He "looked mad" and was "[m]ean-mugging" the group of people in front of the duplex but did not say anything. Shortly thereafter, T. went inside the house. S. and La.N. did not go inside with her; they stayed in the driveway near the left garage. At that time, the left garage door was open, and the right garage door was closed. There were two cars parked in the driveway, one in front of each garage.[2]

According to Z., when T. saw defendant, she began speaking in a loud voice so he could hear her. She was "saying stuff to him[,] like knit-picking [*sic*] and stuff." T. made comments indicating that "she didn't like him." Shortly after T. went inside the duplex, defendant got into the front passenger seat of the Mercedes, leaned forward, and moved his arms like he was manipulating something. As defendant was doing so, he was looking at La.N. and S., which gave La.N. the "vibe" that something was going to happen. After the Mercedes pulled away from the white house, it drove slowly past the duplex, like the occupants were "look[ing] at something" or "seeing who all was outside." At that point, the duplex was on the passenger side of the car. After the car passed the duplex, it sped off. Because La.N. suspected that "something [was] gonna

---

[2] At trial, La.N. could not recall whether any cars were parked in the driveway of the duplex but indicated that he believed the driveway was "empty."

happen," he told S. that they should go inside.  Z., who was sitting on the porch, got up and walked toward the left garage because she was "scared that [she] was gonna get hit."

The Mercedes made a U-turn and drove back toward the duplex.  After the car passed the duplex a second time, it made another U-turn so that the duplex was on the passenger side of the car.  As the car approached the duplex for a third time, it sped up and then stopped suddenly in front of the lawn to the left of the driveway.  At that moment, defendant opened the front passenger door, placed one foot on the ground, leaned out of the car, pointed a black semiautomatic handgun[3] "towards" La.N. and S., and said, "Where you all from?" two times.  In response, La.N. and S., both of whom were in the driveway near the opening of the left garage, ran toward the left garage.  La.N. heard three or four shots.  He dove into a "little pocket" area in the left garage to avoid the gunshots while S. ducked behind some "other things" in front of him near the right garage.[4]

When the shooting started, Z. was "deep" inside the left garage, near the interior door that led inside the duplex.  She immediately turned around and "dropped down."  As she did so, she saw La.N. and S. ducking and running toward her location.  When the shooting stopped, Z. saw the Mercedes speed away and the front passenger door close.  Immediately following the shooting, S. told T. that the shooter was the "boy that was just over there."  When T. said, "Markees with the dreads?" S. responded, "[Y]eah."[5]

---

[3]  The parties stipulated that defendant could not lawfully possess a gun because he had suffered a felony conviction prior to September 11, 2017.

[4]  La.N. testified that it was "dumb" for defendant to commit a shooting during the daytime because he saw defendant's face before the shots were fired.  On cross-examination, La.N. denied that he told a police officer that he did not look at the shooter's face.

[5]  S. did not testify at trial.  Boyfriend testified that he did not want to do so because he did not want to be labeled a "snitch."

7

T. called 911. The call, which was placed at 7:20 p.m., was recorded and played for the jury. During the call, T. said that a man named "Markees" had just shot at her house (i.e., the duplex) from the front passenger seat of a gray Mercedes with tinted windows. She explained that Markees was the boyfriend of a girl her family did not get along with. She further explained that she had seen Markees get into the Mercedes and drive by the duplex shortly before the shooting, and that she was inside the duplex during the shooting but a male witness had seen "exactly . . . what happened." When asked, T. indicated that she did not see the driver of the Mercedes.

*The Investigation*

Police officers arrived at the duplex around 7:30 p.m. The officers found four .380 caliber shell casings in the middle of the street in front of the duplex, indicating that the shooter had used a semiautomatic handgun. There was a bullet hole in the top right corner of the right garage door and a bullet hole in the back interior wall of the left garage about six feet off the ground and 13 feet away from the interior door leading inside the duplex. No other bullet holes were found.

T. told the responding officers that defendant was the shooter and went by the nickname "Kees Mob." When defendant's Facebook profile was pulled-up on a cell phone, T. identified him as the shooter. She also identified defendant from a photograph on a police computer. When La.N. was shown photographs of defendant posted on Facebook, he told the responding officers that defendant was the shooter.

Two days after the shooting, boyfriend identified defendant from a photographic lineup as the person he saw at the white house shortly before the shooting. When asked, boyfriend explained that he was familiar with defendant because defendant had pulled a gun on him "a few months ago."

The next day, La.N. identified defendant as the shooter from a photographic lineup, indicating that he was "positive" defendant was the shooter. When La.N. was interviewed by a detective, he initially said that he did not believe defendant was aiming

8

at him and S. based on his understanding that a bullet had struck the upper portion of the right garage. La.N. opined that defendant must have been aiming at the right garage "because the bullets went where [S.] was," at "the top right garage." When La.N. made his initial statement about the shooting, he was only aware of the bullet hole in the right garage; he did not know about the bullet hole in the interior wall of the left garage until the detective told him about it. Later in the interview, La.N. claimed that defendant was in fact aiming at him. He told the detective, "[T]o be honest with you, [the gun] was pointed right [at] me." La.N. explained that, after the gunshots were fired, he "checked himself for holes" because the gun was aimed at him and he saw "orange flashes coming from the gun." La.N. said that he saw "two to three shots" before he "turned and ran inside the garage."[6]

Around a week after the shooting, defendant, who had shoulder-length dreads at the time, was interviewed by a detective. Defendant gave the detective his phone number but claimed that he did not have his cell phone with him on the day of the shooting because his girlfriend had broken it. However, several days later, and after he was confronted with evidence that his girlfriend had sent him text messages on September 8 and 12, 2017, defendant told the detective that his cell phone was working and that he lost it sometime after September 12, 2017.

When Dwayne's cell phone was searched, it listed defendant's cell phone number as a contact under "Kees," which was added on September 4, 2017.[7] A review of Facebook records revealed that defendant went by the nickname "Kees Mob." Dwayne's

---

[6] At trial, La.N. testified that defendant pointed the gun "directly [his] way." He further testified that he saw one gunshot, and that S. was near the area where the bullet struck the right garage.

[7] At the time of the search, Dwayne was on probation. In fall 2017 he drove a silver four-door Mercedes with tinted windows. Although not entirely clear, it appears that Dwayne [] is the same "Dwayne" that T. said lived at the white house.

cell phone also contained a photograph of him and two other men standing in front of a silver Mercedes with tinted windows on September 14, 2017. In this photograph, Dwayne has a black and silver handgun in his pocket.

Less than two weeks after the shooting, Z. was interviewed by a detective. The interview was recorded and played for the jury. During the interview, Z. indicated that, prior to the shooting, she saw a black man with dreads and a black pullover hoodie get out of a gray Mercedes parked across the street. She said that she was not paying attention to the man's face and only noticed his dreads and chest, but noted that the man was not the driver of the Mercedes.[8] She explained that she was inside the left garage talking to S. and La.N. when the gunshots were fired. According to Z., S. and La.N. were near her, either inside the garage or just outside the garage.

A review of phone records revealed that defendant's cell phone was located near the duplex at the time of the shooting and then near his residence shortly thereafter.

*Jail Phone Call and Search of Jail Cell*

Following his arrest, defendant made a jail phone call on October 20, 2017, which was recorded and played for the jury. During the call, defendant asked a female to take down the phone numbers for "[T.]," "[S.]," and "[La.N.]." He then instructed her to give the phone numbers to "Precious" and to tell Precious to give the numbers to "Rob." He further instructed her to "tell [Rob] to do what he was supposed to . . . do with them. . . . Tell him to try to figure it out." Thereafter, a search of defendant's jail cell revealed a

---

[8] At trial, Z. identified defendant as the shooter for the first time, explaining that she was familiar with him because she had seen him driving around the neighborhood. According to Z., defendant was the man with dreads that got out of the driver's seat of the Mercedes. On cross-examination, Z. denied telling a detective that she had only seen defendant's dreads and chest and not his face. On redirect, she explained that she had lied to the detective about not seeing defendant's face because she did not want to be labeled a "snitch." Z. claimed that everything else she told the detective was true.

police report containing the contact information for T., including a redacted but still visible phone number.

On February 20, 2018, defendant's jail cell was searched again. During that search, officers found a letter addressed to "[A.B.]" from defendant. In the letter, defendant told A.B. that he loved her and promised that he was going to stop acting up. He wrote: "[T]he[y] keep gett[i]n[g] me for dumb shit," and that, "after this Ima be str8." He went on to write: "I hope everything gose good on my next court date[.] [T]he[y] can drop my shit if toya and the nigga play Dumb[.] I hope cuddie really talk to dat bitch man. . . . [T]hey gone drop this shit[,] they don't even goto say shit[,] they can show up but ain't gotta say shit . . . ."

## DISCUSSION

### I

#### *Sufficiency of the Evidence*

A. *Standard of Review*

Defendant claims insufficient evidence supports his conviction as the shooter as well as his intent to kill.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) " 'We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) "[A]

11

reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*); see *People v. Maury*, *supra*, 30 Cal.4th at p. 403 ["Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"]; *People v. Alexander* (2010) 49 Cal.4th 846, 918 (*Alexander*) [it is for jury to weigh the impact of a witness's bias when determining which version of events to credit].)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

B. *Identity*

The defense theory at trial was mistaken identity. In making his insufficiency argument, defendant acknowledges that La.N. testified that he saw the shooting and identified defendant as the shooter. Defendant, however, insists that this evidence is insufficient to establish his identity as the shooter because La.N.'s identification was "at best equivocal" and "inherently suspect." We disagree.

"[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young, supra*, 34 Cal.4th at p. 1181; see *People v. Boyer* (2006) 38 Cal.4th 412, 480 [a single eyewitness's identification of a suspect as the perpetrator of a crime is sufficient to sustain a conviction].) Here, in addition to La.N.'s testimony that he saw defendant shoot at close range from the front passenger seat of a silver Mercedes using a black handgun, there was evidence that La.N. identified defendant as the shooter from photographs shortly after the shooting and from a photographic lineup three days later. Defendant challenges La.N.'s credibility, but we do not reweigh evidence or reevaluate a witness's credibility.

12

(*Alexander, supra,* 49 Cal.4th at p. 917.) Defense counsel had the opportunity to cross-examine La.N. about all aspects of his identification. The jury, therefore, was able to evaluate the credibility of La.N.'s identification and the weight his testimony deserved. (See *People v. Boyer, supra*, 38 Cal.4th at p. 481.) Moreover, independent evidence supported La.N.'s identification of defendant as the shooter. There was evidence that T. and boyfriend were familiar with defendant, and both testified that he was the person riding in the front passenger seat of the silver Mercedes shortly before the shooting. Further, there was evidence that, minutes before the shooting, defendant was the person "mean-mugging" and staring "hard" at the group of people in front of the duplex, "like he had a problem." There was also evidence that defendant was aligned with the Manor girls, had a contentious relationship with the Sac. family (including pointing a black handgun at boyfriend five months earlier), and was verbally taunted by T. minutes before the shooting. The evidence also showed that defendant's cell phone was near the duplex at the time of the shooting. Finally, the letter addressed to "[A.B.]" found in defendant's jail cell following the shooting showed a consciousness of guilt.

On this record, there was ample evidence to support the jury's conclusion that defendant was the shooter. (See *People v. Mohamed* (2011) 201 Cal.App.4th 515, 521 ["[t]o entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all' "]; see also *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497 [when the circumstances of an eyewitness identification and its weight are explored at trial and the trier of fact believes the eyewitness identification, the trier of fact's determination is binding on the reviewing court].)

C. *Attempted Murder Convictions*

The jury found defendant guilty on counts one (S.), two (La.N.), and three (Z.), each of which charged him with willful, deliberate, and premeditated attempted murder. (§§ 664, 187, subd. (a).) On appeal, defendant contends reversal is required because

13

insufficient evidence established he possessed the requisite specific intent to kill. We disagree.

Attempted murder requires " 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*Ibid*.) "Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]" ' " (*Ibid*.) "[T]he crime of attempted murder is not divided into degrees." (*Id*. at p. 740) The prosecution may, as it did here, "seek a jury finding that an attempted murder was 'willful, deliberate, and premediated' for purposes of sentence enhancement." (*Ibid*.)

" 'To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.' [Citation.] Whether the defendant acted with specific intent to kill 'must be judged separately as to each alleged victim.' " (*Smith*, *supra*, 37 Cal.4th at p. 740.)

"[T]he mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]' " (*Smith, supra*, 37 Cal.4th at p. 741.)

The specific intent to kill may also be inferred under the concurrent intent (or "kill zone") theory. (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*); *People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6.) Under the kill zone theory, "a shooter may be convicted of multiple counts of attempted murder . . . where the evidence establishes that

14

the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim." (*Smith, supra*, 37 Cal.4th at pp. 745-746.) " 'This concurrent intent [i.e., "kill zone"] theory is not a legal doctrine requiring special jury instructions . . . . Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.' " (*Id*. at p. 746.) "When the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, however, evidence of a primary target is required." (*Canizales*, at p. 608.)

During closing argument, which occurred after the trial court instructed the jury on attempted murder, the prosecutor argued that defendant intended to kill S. and La.N. specifically by firing four bullets at them at close range. The prosecutor also relied on a kill zone theory as an alternative ground to prove defendant's intent to kill S. and La.N., and as the sole ground to prove defendant's intent to kill Z.

"[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm--that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death--around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm. [¶] In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and

15

the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales, supra*, 7 Cal.5th at p. 607.) "[T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Ibid*.)

In *Canizales*, gang members Bolden and Pride were at a neighborhood block party when Canizales and his companion (Windfield), from a rival gang, drove up and Windfield opened fire. (*Canizales, supra*, 7 Cal.5th at pp. 598-599.) Both Bolden and Pride took off running, Bolden running straight up the street and Pride zigzagging back and forth across the street and hiding behind a bus on the same side of the street where Leica Cooksey and some of her friends were listening to music and dancing. Bolden recalled that bullets were " 'going everywhere.' " Bolden and Pride were not hit, but Cooksey was struck in the abdomen a later died. Five shots had been fired from between 100 and 160 feet away from Bolden, Pride, and Cooksey. (*Id*. at p. 600.)

Our Supreme Court reversed Canizales's conviction for the attempted murder of Bolden because there was insufficient evidence to support the kill zone theory. (*Canizales, supra*, 7 Cal.5th at p. 609.) The court concluded that there was insufficient evidence "to support a reasonable inference that defendants intended to create a zone of fatal harm around a primary target [i.e. Pride]." (*Id*. at p. 610.) In support of this conclusion, the court reasoned: "[T]he evidence at trial showed that Windfield attacked his target by firing five bullets from a nine-millimeter handgun at a distance of either 100 or 160 feet away. Moreover, the attack occurred at a block party on a wide city street, not in an alleyway, cul-de-sac, or some other area or structure from which victims would have limited means of escape. As Bolden described it, the bullets were 'going

16

everywhere' and 'tingling through the gates' as he and Pride ran down the street away from the gunfire after the first shot was fired. [¶] Even accepting as more credible the prosecution's evidence that Windfield was 100 feet rather than 160 feet away from Pride and Bolden when he first fired in their direction, we conclude that a fact finder could not reasonably infer defendants intended to create a zone of fatal harm around Pride based on the record in this case. The evidence presented here showed that from a substantial distance Windfield shot five bullets in the direction of a target who immediately ran down a city street after the first shot was fired. This evidence was insufficient to support instruction on the kill zone theory." (*Id*. at p. 611.)

*Canizales* cited and relied on the court's prior decision in *Bland*, which "expressly embraced the concept of a *concurrent* intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*Canizales, supra*, 7 Cal.5th at p. 602.) "*Bland* applied what is now commonly referred to as the 'kill zone' theory to uphold the attempted murder convictions in that case. The record there showed that the defendant and a fellow gang member approached a car in which a rival gang member was sitting in the driver's seat and opened fire with a .38-caliber handgun, shooting numerous rounds both into the vehicle and at the vehicle as it drove away. The driver was killed and his two passengers, who were not gang members, were wounded. [Citation.] We concluded that the evidence 'virtually compelled' a finding that even if the defendant primarily intended to kill the rival gang member, he also, concurrently, intended to kill the passengers in the car, or, at the least, intended to create a zone of fatal harm." (*Id.* at p. 603.)

Viewing the evidence in the light most favorable to the judgment, we find sufficient evidence from which a jury could have reasonably concluded beyond a reasonable doubt that defendant acted with the requisite specific intent to kill all three named victims. The circumstances of this case are more analogous to the facts in *Bland* than those in *Canizales*. Here, defendant fired four bullets in the direction of La.N., S.,

17

and Z. at close range. He initially aimed the gun directly toward La.N. and S., while near the driveway of the duplex. La.N. and S. were standing next to each other near the opening of the left garage and Z. was inside the left garage. In response to the gunshots, Z. dropped to the ground while La.N. and S. ran toward the left garage and ducked. La.N. dove into the left garage to avoid the gunshots while S. ducked behind items in front of La.N. by the right garage. One of the bullets struck the right garage in the area near where S. had been, and another bullet struck the back interior wall of the left garage in the area where Z. was located.

On this record, a rational jury could have inferred that defendant acted with the intent to kill La.N. and S. specifically. (*Smith, supra*, 37 Cal.4th at p. 742 [The "act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice"].) A rational jury could also have inferred that defendant had the specific intent to kill Z. under a concurrent intent (i.e., kill zone) theory because she was located in the zone of fatal harm created by defendant when he fired multiple rounds at his primary targets, La.N. and S.[9] We recognize that the *Canizales* court held that "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk.' " (*Canizales, supra*, 7 Cal.5th at p. 607.) But the type and extent of the force used, the distance between defendant and the victims, the proximity of Z. to La.N. and S., and the confined space in which the attack occurred, support the conclusion that defendant intended to kill everyone within the immediate area of La.N. and S., including Z. There is no requirement that a defendant be aware of who is in the zone of fatal harm to support a conviction for attempted murder based on a kill zone theory. (See *People v. Vang*

---

[9] For the reasons we discuss, assuming that La.N. alone was the primary target, the evidence presented was susceptible of the inference that defendant intended to kill La.N. by killing everyone in his vicinity, including S. and Z.

(2001) 87 Cal.App.4th 554, 564 [rejecting defendants' argument that they could not be convicted of attempted murder as to someone they did not know was in the residence when they opened fire at the residence]; see also *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023 ["Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm."].)  Finally, we note that, in addition to the circumstances of the shooting, there was evidence of motive--defendant's contentious relationship with the Sac. family and T. taunting him minutes before the shooting--that supported a finding of defendant's intent to kill La.N. and S. by killing everyone in their vicinity.  (See *Smith, supra*, 37 Cal.4th at p. 751 [evidence of motive can support intent to kill].)

Defendant points to various purported inconsistencies or conflicts in the evidence to show that there was insufficient evidence of his intent to kill.  However, in making this argument, defendant misapprehends our role on appeal.  His argument amounts to a request that we reweigh the evidence, which is not the function of an appellate court. (*Young, supra,* 34 Cal.4th at p. 1181.)  As we have explained, there was sufficient evidence from which a reasonable jury could have concluded that defendant possessed the requisite specific intent to be convicted of the attempted murder counts.[10]

D.  *Discharging a Firearm from a Motor Vehicle at Another Person*

The jury found defendant guilty on counts eight (S.), nine (La.N.), and eleven (Z.), which charged him with discharging a firearm from a motor vehicle at another person

---

[10]  We recognize that a trial court should only instruct a jury on the kill zone "in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*Canizales, supra*, 7 Cal.5th at p. 608.)  However, we need only decide whether sufficient evidence supports that determination by the jury, not whether another reasonable inference was unavailable as a matter of law.

19

other than an occupant of a motor vehicle. (§ 26100, subd. (c).) On appeal, defendant contends reversal is required because his convictions on these counts are not supported by substantial evidence. He argues the prosecution failed to present sufficient evidence to establish that he was "inside" or "within" a motor vehicle when the gunshots were fired, and/or that he shot "at" any of the alleged victims. We disagree.

### 1. *Generally Applicable Legal Principles*

Section 26100, subdivision (c) provides: "Any person who willfully and maliciously discharges a firearm from a motor vehicle at another person other than an occupant of a motor vehicle is guilty of a felony punishable by imprisonment in state prison for three, five, or seven years." The elements of the offense are " '(1) acting willfully and maliciously, and (2) shooting from a motor vehicle at a person outside a motor vehicle.' " (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1167.) " 'Conviction under a statute proscribing conduct done "willfully and maliciously" does not require proof of a specific intent. [Citation.]' [Citations.] ' "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intent is deemed to be a general criminal intent . . . . The only intent required for a general intent offense is the purpose or willingness to do the act or omission. [Citation.]" ' " (*Id.* at p. 1168.)

"Cases construing section 246, which prohibits 'maliciously and willfully discharg[ing] a firearm at an inhabited dwelling house' or other specified targets, are instructive" in determining the intent requirement for shooting from a motor vehicle at another person. (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1500.) Under section 246, criminal liability " 'is not limited to the act of shooting directly "at" an inhabited or occupied target. Rather, the act of shooting "at" a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike

20

the target or persons in or around it. The defendant's conscious indifference to the probability that a shooting will achieve a particular result is inferred from the nature and circumstances of his act.' " (*Id.* at p. 1501.)

### 2. *Analysis*

We reject defendant's initial contention that the evidence was insufficient to establish he discharged a firearm *from* a motor vehicle. According to defendant, criminal liability does not attach under section 26100, subdivision (c) unless the shooter was "inside" or "within" the motor vehicle at the time of the shooting. As we shall explain, defendant's claim fails because the statute cannot properly be interpreted in the manner he suggests.

We exercise de novo review in addressing this issue of statutory interpretation. (*People v. Brewer* (2011) 192 Cal.App.4th 457, 461.) " 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' [Citation.] In approaching this task, we 'must first look at the plain and commonsense meaning of the statute because it is generally the most reliable indicator of legislative intent and purpose.' " (*People v. Skiles* (2011) 51 Cal.4th 1178, 1185; *People v. Flores* (2003) 30 Cal.4th 1059, 1063 [we give the words of the statute their usual and ordinary meaning].) "When the language of a statute is clear, we need go no further." (*Flores*, at p. 1063.) Where the language of the statute is potentially ambiguous, " '[i]t is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation.' [Citation.] We may also consider extrinsic aids such as the ostensible objects to be achieved, the evils to be remedied, and public policy.' " (*People v. Manzo* (2012) 53 Cal.4th 880, 886.) " '[W]e may not add to or alter [the words of the statute] to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' " (*Trope v. Katz* (1995) 11 Cal.4th 274, 280.)

As noted, section 26100, subdivision (c) is violated when a person "discharges a firearm *from* a motor vehicle at another person other than an occupant of a motor vehicle . . . ." (§ 26100, subd. (c), italics added.) The word "from" is a preposition commonly "used to indicate the source or beginning of something in terms of location, situation, or time." (Encarta World English Dict. (1st ed. 1999) p. 716, col. 1.) It is "used as a function word to indicate the starting or focal point of an activity." (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 502, col. 2-3.) Thus, the usual and ordinary meaning of the word "from" does not support defendant's position. The flaw in defendant's argument is that he construes the word "from" to mean that a shooter's entire body, or at least a large portion thereof, must be "inside" or "within" a motor vehicle at the time of the shooting. The plain text of the statute, however, does not impose such a requirement and it would be improper for us to add one. Moreover, adopting defendant's construction of the statute would contravene the legislative intent of the statute--the deterrence of drive-by shootings. (See *In re Ramon A*. (1995) 40 Cal.App.4th 935, 940; see *People v. Gonzales* (2015) 232 Cal.App.4th 1449, 1456.) Defendant has not cited any case law, legislative history, or public policy that persuades us that we should adopt his position.

Defendant's reliance on *People v. Jones* (2010) 187 Cal.App.4th 266, is misplaced. In that case, the appellate court held that "a person standing outside a vehicle who, while holding a gun, reaches into the vehicle through an open window or door and fires the gun, may be convicted of shooting 'at' an occupied vehicle" in violation of section 246. (*Id*. at p. 268.) In so holding, the court reasoned, "One would not normally consider a person to be 'within' a vehicle if only her hand, or an object that she is holding in her hand, has broken the plane of the vehicle through an open window or door. Rather, in order to be considered to be 'within' a vehicle, a person's entire body, or a large portion of the person's body, would have to be inside the vehicle. It follows that if the person is holding a gun and fires the gun after having broken the plane of the vehicle with

either the gun or her hand and the gun, that person cannot be deemed to have discharged the gun from 'within' the vehicle for purposes of section 246." (*Id.* at pp. 273-274.)

*Jones* is distinguishable and does not support the conclusion that defendant did not discharge a firearm *from* a motor vehicle under the circumstances of this case. Moreover, even if we assume, as defendant suggests, that criminal liability does not attach under section 26100, subdivision (c) unless a large portion of a defendant's body is inside or within a vehicle, we would find that such a requirement was satisfied here. The evidence presented at trial showed that defendant opened the door of the car, placed one foot on the ground, leaned out of the car, and then fired multiple gunshots.

We also reject defendant's contention that the evidence was insufficient to support the jury's conclusion that he shot "at" S., La.N., and Z. As we have recounted in detail above, the evidence adduced at trial showed that defendant, from close range, fired four bullets from a .380 caliber handgun in the direction of S., La.N., and Z. While there was evidence that, at the time of the shooting, Z. was deep in the garage near the interior door that led inside the duplex, defendant's act of firing bullets in her direction while in close proximity to her was sufficient to establish that he shot "at" her for purposes of section 26100, subdivision (c). (See *People v. Hernandez, supra,* 181 Cal.App.4th at p. 1501.)

II

*Alleged Instructional Errors*

A. *Kill Zone Theory*

Defendant contends that his attempted murder convictions must be reversed because the trial court prejudicially erred in instructing the jury on the kill zone theory. He argues that the standard instruction regarding attempted murder (CALCRIM No. 600) misinstructs on the kill zone theory; he adds that the modifications the trial court made to the standard instruction designating the targeted and nontargeted victims were erroneous. We agree with the latter contention but conclude that the error was only prejudicial as to defendant's conviction for the attempted murder of Z.

23

1. *Validity of CALCRIM No. 600*

Defendant argues that CALCRIM No. 600 erroneously instructs on the kill zone theory because it does not require the jury to find that the prosecution proved the defendant intended to kill the targeted victim(s). He contends that CALCRIM No. 600 improperly instructs the jury that proof of intent is sufficient if the prosecution proves the defendant "intended to kill everyone within the kill zone"; the instruction does not require the jury to make any other or further finding of an intent to kill. We disagree.

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law . . . ." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) As relevant here, the version of CALCRIM No. 600 in effect at the time of trial provided as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of ____ *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory >*, the People must prove that the defendant not only intended to kill ____ *< insert name of primary target alleged >* but also either intended to kill ____ *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory >*, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill ____ *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory >* or intended to kill ____ *<insert name or description of primary target alleged >* by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of ____ *<insert name or description of victim charged in attempted murder count[s] on concurrent-intent theory >*." (See CALCRIM former No. 600 (2013).)

The standard kill zone instruction given in this case was similar to the one given in *Canizales*, *supra*, 7 Cal.5th at page 601, footnote 3, which was decided more than six months after the jury returned its verdicts in this case. Because the *Canizales* court

concluded that the instruction should not have been given on the facts presented, it did not reach the contention that the instruction violated due process principles by leading the jurors to believe they could convict defendants of the attempted murder of one victim without finding the requisite intent to kill. (*Id.* at pp. 597-598.) The *Canizales* court, however, indicated that the standard instruction "should be revised to better describe the contours and limits of the kill zone theory . . . ." (*Id.* at p. 609.) The court did not propose language revising the instruction, nor did it indicate it was error to give the standard instruction.

Defendant cites no authority supporting the conclusion that the standard kill zone instruction at issue in this case is invalid. The standard instruction tells the jury that, in order to find defendant guilty of attempted murder of a nontargeted victim under a concurrent intent (kill zone) theory, it must find that the defendant *not only* intended to kill a primary target *but also* either intended to kill the nontargeted victim, *or* intended to kill everyone within the kill zone. (See CALCRIM former No. 600 (2013).) Thus, contrary to defendant's contention, the instruction does in fact require the jury to find that the prosecution proved that the defendant intended to kill a targeted victim in order to find the defendant guilty of the attempted murder of a nontargeted victim under a concurrent intent (kill zone) theory.

### 2. *Trial Court's Modified Version of CALCRIM No. 600*

As relevant here, the trial court instructed the jury with CALCRIM No. 600, modified to designate the target and non-target victims as follows: "To prove that the defendant is guilty of attempted murder, the People must prove that one, the defendant took at least one direct but ineffective step toward killing another person: [¶] And two, the defendant intended to kill that person. The court further instructed, "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone. [¶] In order to convict the defendant of the attempted murder of [S.], Count 1, [La.N.], Count 2, or [Z.], Count 3, the People must

25

prove that the defendant not only intended to kill [S.], [La.N.], or [Z.], but also either intended to kill one of the other two named victims in Counts 1, 2, or 3 or intended to kill everyone within the kill zone. [¶] If you have a reasonable doubt whether the defendant intended to kill [S.], [La.N.] or [Z.] or intended to kill [S.], [La.N.], or [Z.] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [S.], [La.N.], or [Z.]."

The kill zone instruction was drafted by the trial court. The prosecutor requested the court give the instruction as drafted, and defense counsel indicated that he was "okay with the language" of the instruction. There was no discussion about primary target(s) or nontargeted victim(s), and the prosecutor did not indicate that he was relying on the kill zone theory to support any specific count of attempted murder.

During closing argument, which occurred after the trial court instructed the jury, the prosecutor argued that defendant intended to kill La.N. and S. specifically because he fired four bullets at them at close range. In support of his argument, the prosecutor noted that La.N. testified that defendant aimed the gun "right at [him]" and S. was standing near him. The prosecutor also noted that one of the bullet holes was in the area where La.N. and S. were standing when the shooting started, and another bullet hole was in the area where S. fled in response to the shooting. To satisfy the element of intent, the prosecutor also relied on a kill zone theory. The prosecutor told the jury that the kill zone theory applied if the defendant intended to kill one or more of the "named victims" and at the same time intended to kill everyone within the zone of harm around the named victims. According to the prosecutor, all of the people in and around the garage at the time of the shooting, La.N., S., and Z., were in the kill zone, "where the bullets were flying." He told the jury, "So if you find . . . that not only was [defendant] trying to kill one of these individuals but everyone that was in that zone, he is liable for attempted murder of all three victims assuming you find all three victims in that kill zone." The record reflects that the prosecutor relied on the kill zone theory as the sole means of establishing the

26

intent element as to Z. and as an alternative ground to satisfying the intent element as to S. and La.N.

The designation of targeted and nontargeted victims was error. Based on the evidence adduced at trial, La.N. and S. were the primary targets and Z. was the nontargeted victim. But the instruction identified all three alleged victims as potential nontargeted victims *and* potential primary targets, and then told the jury that defendant could not be convicted of attempting to murder each unless the People proved that he not only intended to kill one of them, but also either intended to kill one of the other two alleged victims, or intended to kill everyone within the kill zone. As defendant points out, the instruction allowed the jury to return a guilty verdict for all three victims after finding that he intended to kill only two of them. In other words, the jury could have returned guilty verdicts on the attempted murder counts without finding that defendant possessed the requisite specific intent to kill each victim.

In view of the instructional error, we must examine the entire cause and determine whether it is clear beyond a reasonable doubt that the error did not affect the jury's verdict. (*People v. Aledamat* (2019) 8 Cal.5th 1, 13; *Canizales, supra,* 7 Cal.5th at p. 615.) We conclude that reversal is only required as to defendant's conviction for the attempted murder of Z.

As set forth in detail *ante*, the evidence that defendant specifically intended to kill La.N. and S. was compelling. He fired multiple shots from close range at both of them; he had a contentious relationship with the Sac. family and had brandished firearms during disputes with them before, and he had been taunted by a family member immediately before the shooting. To establish intent to kill La.N. and S., the prosecutor primarily relied on the theory that defendant specifically intended to kill them because he fired multiple rounds at them from close range. We are convinced that the erroneous kill zone instruction was harmless beyond a reasonable doubt as to La.N. and S.

27

However, we reach a different conclusion with respect to Z. There was little evidence outside application of the kill zone theory of defendant's intent to kill Z. Although Z. had been outside talking to the others prior to the shooting, she was deep inside the garage near the interior door that led inside the duplex when defendant opened fire. There was no evidence that defendant aimed his gun at her during the shooting, or even saw her at that time. It is not clear beyond a reasonable doubt that a reasonable jury would conclude defendant intended to kill Z.

The erroneous kill zone instruction and the prosecutor's closing argument further support a finding of prejudice. As we have explained, the prosecutor relied solely on the concurrent intent (kill zone) theory to establish the intent element. He argued that Z. was in the kill zone, which he defined as "in and around the garage," because she was in the area where the "bullets were flying." In making this argument, the prosecutor said: "An example of shooting into a crowd at a stadium. Someone goes to a football stadium. There is a big crowd of people and I take a gun and I shoot it at somebody. I . . . not only intend to kill one but at the same time I intend to kill everyone in that zone. That's . . . a zone of danger or kill zone." This was not an accurate statement of the law; instead the *Canizales* court found that a similar definition of the kill zone theory "was significantly broader than a proper understanding of the theory permits," and therefore "had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability under the kill zone theory. So misled, the jury might well have found factual support for what was effectively an 'implied malice' theory of attempted murder without detecting the legal error." (*Canizales, supra*, 7 Cal.5th at p. 614; see *People v. Medina* (2019) 33 Cal.App.5th 146, 155 [holding that allowing the kill zone instruction based on an asserted natural and probable consequence that anyone within a zone of harm could die "replaces the specific intent/express malice required for an attempted murder conviction with

conscious disregard for life/implied malice, which *Bland* makes clear cannot support an attempted murder conviction"].)

As the *Canizales* court noted, the jury's questions during deliberations can be instructive on the issue of prejudice. (*Canizales, supra*, 7 Cal.5th at p. 617.) During deliberations here, the jury requested a readback of the portion of La.N.'s testimony related to what occurred "at the time of the shooting." Shortly after the readback, the jurors asked whether they needed to come to an agreement on the attempted murder count involving Z. and what to do if they could not do so.

Finally, while the jury's findings on sentencing enhancement allegations can be relevant to the prejudice analysis (*Canizales, supra*, 7 Cal.5th at p. 618), the jury's true findings as to the allegation that defendant acted willfully, deliberately, and with premeditation in attempting to murder Z. does not show an absence of prejudice here. As the *Canizales* court explained, "the true findings regarding the allegation that [defendant] acted with deliberation and premeditation in attempting to murder [the alleged victim] do not affect our [prejudice] determination. . . . [T]he kill zone theory permits the jury to infer that the defendant harbored the requisite specific intent to kill the primary target *and* everyone within the zone of fatal harm. Thus, the jury would have found a specific intent to kill were it to have relied solely on the kill zone theory of attempted murder liability." (*Ibid.*)

We cannot conclude that it is clear beyond a reasonable doubt the instructional error did not affect the verdict. Accordingly, we will reverse the attempted murder conviction regarding Z. Because we concluded *ante* that the evidence was sufficient to support a conviction for attempted murder of Z. based on the kill zone theory, we remand for possible retrial on that count. (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 [retrial after reversal permitted except when evidence was insufficient].)

B. *Attempted Voluntary Manslaughter*

Defendant contends the trial court prejudicially erred by failing to instruct the jury sua sponte on the lesser included offense of attempted voluntary manslaughter based on heat of passion as a result of provocation. He argues there was sufficient evidence from which a jury could have reasonably concluded he committed this offense. We disagree.

1. *Applicable Legal Principles*

"[A] trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. [Citation.] It is error for a trial court not to instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the question is substantial enough to merit consideration by the jury." (*People v. Booker* (2011) 51 Cal.4th 141, 181.) However, " '[a]n instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 538 (*Nelson*).) "Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed." (*People v. Simon* (2016) 1 Cal.5th 98, 132.) "The 'substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak' " ' " (*Nelson, supra*, 1 Cal.5th at p. 538), and "[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense" (*People v. Simon, supra*, 1 Cal.5th at p. 132). We independently review whether the trial court improperly failed to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.) We review the evidentiary support for a lesser included offense instruction in the light most favorable to the defendant. (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Manslaughter is the unlawful killing of a human being without

30

malice." (§ 192, subd. (a).) "Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter. Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*Nelson, supra*, 1 Cal.5th at p. 538.) Just as voluntary manslaughter is a lesser included offense of murder, so too is attempted voluntary manslaughter a lesser included offense of attempted murder. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708-709; *People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824-825.) The crime of attempted voluntary manslaughter requires a specific intent to kill a human being and at least one direct but ineffective step toward killing the person. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549-1550; CALCRIM No. 603.)

A heat of passion theory has both objective and subjective components. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) To satisfy the objective component, the defendant's heat of passion must be due to sufficient provocation. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) The provocative conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*Id.* at pp. 550.) " ' "[N]o specific type of provocation [is] required," ' " and "the passion aroused need not be anger or rage, but can be any ' " [v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citations] other than revenge [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)

To satisfy the subjective component, the defendant must "have killed [or attempted to kill] while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] 'Heat of passion arises when "at the time of the killing [or attempted killing], the reason of the [defendant] was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to

31

act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' " (*Moye, supra*, 47 Cal.4th at p. 550.)

### 2. *Analysis*

We find no instructional error. Even viewing the evidence in the light most favorable to defendant, there was insufficient evidence to support heat of passion.

As for the objective component, the evidence adduced at trial reflected a contentious relationship with the Sac. family and verbal taunting prior to the shooting, but these circumstances are insufficient to permit a jury to reasonably conclude that a person of average disposition would become so inflamed as to lose reason and judgment. (See *People v. Enraca* (2012) 53 Cal.4th 735, 759 ["we have rejected arguments that insults . . . would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter"]; *People v. Manriquez*, *supra*, 37 Cal.4th at p. 586 [calling the defendant "a 'mother fucker' " and taunting him by "repeatedly asserting that if defendant had a weapon, he should take it out and use it" "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment"]; *People v. Najera* (2006) 138 Cal.App.4th 212, 216, 226 & fn. 2 [victim's name calling, including calling the defendant a "faggot," and pushing the defendant to the ground were not sufficient to satisfy objective component of heat-of-passions manslaughter].)

Likewise, the evidence presented was insufficient to establish the subjective component. Defendant did not testify at trial, and no evidence was presented demonstrating that the shooting occurred while he was under the actual influence of a strong passion induced by adequate provocation. (*Moye, supra*, 47 Cal.4th at p. 550.) Defendant's state of mind was never at issue or argued by the defense. As we have noted, the defense theory was mistaken identity. The critical issue at trial was the identity of the shooter. Accordingly, the subjective component was not satisfied. " 'A trial court need not . . . instruct on lesser included offenses when the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime (for

32

example, when the only issue at trial is the defendant's identity as the perpetrator). Because in such a case "there is no evidence that the offense was less than that charged" [citation], the jury need not be instructed on any lesser included offense.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 825-826.)[11]

C. *Discharging a Firearm from a Motor Vehicle at Another Person*

As previously indicated, the jury found defendant guilty of discharging a firearm from a motor vehicle at all three charged victims. (§ 26100, subd. (c).) Defendant contends the trial court prejudicially erred by failing to instruct the jury sua sponte on the lesser included offense of willfully discharging a firearm from a motor vehicle (§ 26100, subd. (d)). He argues that there was evidence from which a jury could have reasonably concluded that he committed this offense. The People agree that section 26100, subdivision (d) is a lesser included offense of section 26100, subdivision (c), but argue that reversal is not required because the record does not contain substantial evidence that defendant was guilty of the lesser offense but not the greater offense, and that, in any event, defendant suffered no prejudice.

We agree with the parties that discharging a firearm from a motor vehicle is a lesser included offense of discharging a firearm from a motor vehicle at another person, because the greater offense cannot be committed without also necessarily committing the lesser.[12] (See *People v. Ramirez* (2009) 45 Cal.4th 980, 985.) However, any prejudice

---

[11] Because we have rejected defendant's claim of instructional error on the merits, we need not and do not address defendant's contention regarding the doctrine of invited error.

[12] Section 26100, subdivision (c) provides: "Any person who willfully and maliciously discharges a firearm from a motor vehicle at another person other than an occupant of a motor vehicle is guilty of a felony . . . ." Subdivision (d) of the same statute provides, "[A]ny person who willfully and maliciously discharges a firearm from a motor vehicle is guilty of a public offense . . . ." (§ 26100, subd. (d).)

from the failure to instruct on a lesser included offense may be eliminated where, as here, the jury necessarily decided the factual questions posed by the omitted instructions adversely to the defendant under properly given instructions. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 191.) In this case, the jury found defendant guilty of assault with a semiautomatic firearm (§ 245, subd. (b)) as to all three victims; these findings render the alleged instructional error harmless by resolving factual issues against the defendant. In finding defendant guilty of these crimes under the circumstances of this case, the jury necessarily determined that defendant fired gunshots *at the victims*.[13] There was no evidence of any shots fired other than those from the car, which the jury found to be fired at the victims by finding defendant assaulted the victims with a firearm.

D. *Instruction on Witness Identification*

Defendant contends the trial court prejudicially erred by improperly instructing the jury, pursuant to CALCRIM No. 315, that it could consider witness certainty when assessing identification evidence. He argues that: "In light of an established body of scientific evidence, it is clear that CALCRIM No. 315 is erroneous because it ratifies the common misperception that an eyewitness's certainty regarding his or her identification correlates with accuracy." We disagree.

As an initial matter, we agree with the People that defendant has forfeited his claim. Defendant concedes that he did not object to CALCRIM No. 315 or request that it be modified. In *People v. Sánchez* (2016) 63 Cal.4th 411, which involved CALCRIM No. 315's predecessor, CALJIC No. 2.92, our Supreme Court concluded that the defendant forfeited a similar claim by failing to request modification of the pattern

---

[13] The trial court instructed the jury with CALCRIM No. 875. As relevant here, that instruction stated: "To prove that the defendant is guilty of [assault with a firearm], the People must prove that: [¶] 1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully."

34

instruction. (*Id*. at p. 461 ["If defendant had wanted the court to modify the instruction, he should have requested it. The trial court has no sua sponte duty to do so."]; see *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199 [claim challenging validity of CALCRIM No. 315 forfeited for failure to object].)

In any event, the claim lacks merit. As noted, we review de novo whether an instruction correctly states the law. (*People v. Posey, supra,* 32 Cal.4th at p. 218.) In *Sánchez*, the court found no error in the trial court instructing the jury that it could consider " 'the extent to which the witness is either certain or uncertain of the identification' " when assessing the accuracy of an eyewitness identification. (*People v. Sánchez, supra,* 63 Cal.4th at p. 461.) In so finding, the court explained: "Studies concluding there is, at best, a weak correlation between witness certainty and accuracy are nothing new. . . . In *People v. Wright* (1988) 45 Cal.3d 1126, 1141, we held 'that a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence.' We specifically approved CALJIC No. 2.92, including its certainty factor. [Citation.] We have since reiterated the propriety of including this factor." (*Id*. at p. 462.) As with CALJIC No. 2.92, CALCRIM No. 315 lists the certainty factor in a "neutral" manner and does "not suggest that certainty equals accuracy." (*Sánchez*, at p. 462; see *Rodriguez*, *supra*, 40 Cal.App.5th at p. 200 [trial court did not err in instructing the jury on the certainty factor in CALCRIM No. 315].) Thus, because the challenged portion of CALCRIM No. 315 is a correct statement of the law, there was no instructional error.

We recognize that the Supreme Court has granted review in *People v. Lemcke* (review granted Oct. 10, 2018, S250108), to consider whether "instructing a jury with CALCRIM No. 315 that an eyewitness's level of certainty can be considered when evaluating the reliability of the identification violate[s] a defendant's due process rights?"

However, *Sánchez* remains good law, which we are bound to follow. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

E. *Instruction on April 2017 Evidence*

Defendant contends the trial court prejudicially erred in failing to instruct the jury sua sponte on the limited admissibility of the evidence regarding his conduct in connection with the April 2017 incidents at the duplex, including the incident where he pointed a gun at boyfriend, which was admitted as relevant to his motive and the witnesses' ability to identify him as the shooter due to their prior contact with him. In support of his position, defendant argues that this case is an extraordinary case in which the trial court had a duty to give a limiting instruction, such as the one contained in CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.), since the prior acts evidence was a dominant part of the case against him and was highly prejudicial and minimally relevant. We disagree.

First, the evidence was not admitted as "uncharged offense" evidence, subject to section 1101, subdivision (a)'s prohibition of propensity or character evidence and section 1101, subdivision (b)'s exceptions thereto. Nor did the People seek admission on that basis. The analysis was the relevance of defendant's ongoing conduct with the Sac. family members in April 2017 to his later charged actions in shooting at them. The trial court found the conduct relevant to defendant's motive as well as the witnesses' ability to identify him and that the probative value of that evidence outweighed any prejudice from its introduction. Thus, although it is true that the trial court referenced motive and identity when speaking to the relevance of the April 2017 evidence, it did not base its decision on an exception to a rule limiting admission.

"[A]lthough a court should give a limiting instruction on request, it has no sua sponte duty to give one." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051; *People v. Collie* (1981) 30 Cal.3d 43, 63-64 [no sua sponte duty to give limiting instruction on evidence of past criminal conduct].) While the general rule does not require the court sua

36

sponte to give a limiting instruction, there is an exception for "an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that the *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence." (*Collie*, at p. 64.)

On this record, we cannot conclude that the evidence at issue here was a dominant part of the evidence against defendant and both highly prejudicial and minimally relevant to any relevant purpose. Here, the dominant part of the evidence against defendant was the testimony and other evidence related to the events that occurred on the night of the shooting, and the evidence supporting the identification of defendant as the shooter following the shooting. The evidence of the prior incidents at the duplex was highly relevant to show why defendant did what he did on the day of the shooting, and how the witnesses were able to recognize and identify him that day due to these previous interactions, but it certainly was not a central part of the proof of his actions on the night of the shooting. Given the evidence of the charged crimes, the additional evidence at issue was not particularly prejudicial and was relatively brief. Accordingly, we conclude the trial court did not have a sua sponte duty to give a limiting instruction.

III

*Prosecutorial Misconduct*

Defendant contends reversal is required because the prosecutor committed prejudicial prosecutorial misconduct by soliciting gang evidence in violation of a court order. We disagree.

A. *Additional Background*

During a pretrial hearing, the trial court indicated that it did not anticipate that the parties would present any gang-related evidence at trial. Thereafter, the prosecutor stated that while defendant was a validated member of the Strawberry Manors street gang and

37

Dwayne was a validated member of the 4th Avenue Bloods, he did not intend on eliciting any "explicit gang evidence" and would instruct his witnesses not to mention the word "gang." The prosecutor noted that he intended to introduce some photographs of defendant which depicted him throwing gang signs but assured the trial court that he would not elicit any testimony as to what defendant was doing with his hands in those photographs. The trial court directed the prosecutor to advise his witnesses that there is a court order prohibiting them from making any gang references during their testimony.

On appeal, defendant contends the prosecutor violated the trial court's order on three occasions. The first instance of alleged misconduct occurred when the prosecutor was questioning a detective about certain Facebook messages involving Dwayne (also known as "Ibm DAS") and someone with the username "Murdagang Bossup." The relevant exchange is as follows:

"Q. Gonna show you 114. This is another thread from Ibm with murder da gang bapso (phonetic)?

"A. Yes.

"Q. Direct your attention to -- to down here, this message from Ibm sent on January 1st 2018.

"The body states who GT 380 shells?

"Is that what it states?

"A. Yes.

"Q. And what does that mean to you?

"A. Who got 380 shells as in who has .380 caliber shells.

"[Q]. Are you familiar with what shell casing were recovered in this case?

"A. Yeah. .380 caliber."

The second alleged instance of misconduct occurred shortly thereafter during the following exchange with the same detective about a Facebook message "thread between Kees Mob [i.e. defendant] and Ibm":

38

"Q. So this is the same thread that we saw on [Dwayne's] phone, this one just happens to be from the search warrant through Kees Mob?

"A. Correct.

"Q. So quickly we'll go over it. Showing you page four. [¶] And again, we just see the history dating back of Ibm DAS 9/4/17. And this is [when] Ibm added Kees Mob on Facebook messenger?

"A. Yes.

"Q. And I just want to make you two people or page two. [¶] First of all, does this appear to be the same -- remember when we were on Ibm DAS, we saw a Facebook post with a picture that didn't come through?

"A. Correct.

"Q. Does this appear to be the same version but the picture went through?

"A. Yes.

"Q. And it's a phone that says tag someone who never switched up and then has two emojis?

"A. Correct.

"Q. What does that mean to you?

"A. It's basically saying in the gang world switched up, converting to the other side. Says tag somebody, give somebody props for not switching up.

"Q. So it's just on being --

"A. For being loyal to your gang and no.

"Q. Okay. What's the -- emoji with the smiley?

"A. Speculating.

"Q. Got it. I don't want . . . you [to] speculate. [¶] And then just the front is just the beginning of the conversation, right?

"A. Appears so, yes."

39

The third instance of alleged misconduct occurred when the prosecutor was questioning a Sacramento County Sheriff's Deputy.  The challenged exchange is as follows:

"Q.  Good afternoon, Deputy.

"A.  Good afternoon.

"Q.  Where are you currently employed?

"A.  The Sacramento County Sheriff's Department.

"Q.  In what position?

"A.  Work in the main jail, gang intelligence unit.

"Q.  So it's intel, right?

"A.  Correct.

"Q.  You do intel on the entire jail?

"A.  Correct."

The deputy went on to testify that he monitored the jail's mail and phone system and explained how the voice recognition system worked.

B.  *Applicable Legal Principles*

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order.  [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.)  If the prosecutor asks a question that is likely to elicit a reference to inadmissible evidence, the question may constitute "misconduct even if the prosecutor did not intend to elicit such a reference." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1405.)  Therefore, "[a] prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence.  [Citations.]  If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement." (*People v. Warren* (1988) 45 Cal.3d 471, 481-482.)

"Under California law, to establish reversible prosecutorial misconduct a defendant must show that the prosecutor used ' "deceptive or reprehensible methods" ' and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.]" (*People v. Caro* (2019) 7 Cal.5th 463, 510.) A prosecutor's misconduct violates the federal Constitution if the behavior is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Redd* (2010) 48 Cal.4th 691, 731.) "To preserve a claim of prosecutorial misconduct for appeal, a defendant must object and request an admonition. [Citations.] An exception exists where the objection and request for admonition would have been 'futile or ineffective.' " (*Caro,* at p. 510.)

C. *Analysis*

As an initial matter, we agree with the People that defendant has forfeited his misconduct claims. Defendant concedes that he did not object to the challenged conduct as prosecutorial misconduct or request an admonition, and he does not argue that an objection or request for an admonition would have been futile. But even if we were to address the merits, we would find no prejudicial misconduct. The record does not reflect that the prosecutor made a deliberate effort to inject prohibited gang evidence into this case. The prosecutor did not ask any witness a question that called for a response directly indicating that defendant was in a gang or was affiliated with a gang. The brief and oblique gang-related references at trial suggesting defendant was affiliated with a gang or associated with people in a gang were insufficient to infect the trial with unfairness (*People v. Caro, supra,* 7 Cal.5th at p. 510), and the prosecutor's conduct did not amount to the "use of 'deceptive or reprehensible methods' " to attempt to persuade the jury (*People v. Riggs* (2008) 44 Cal.4th 248, 298). In view of the compelling evidence of defendant's guilt (as discussed *ante*), the challenged gang-related testimony did not prejudice him or deny him a fair trial.

IV

*Senate Bill No. 136*

Defendant contends, and the People concede, that the four one-year prior prison term enhancements (§ 667.5, subd. (b)) imposed by the trial court must be stricken under Senate Bill No. 136.  We agree.

At the time defendant was sentenced in March 2019, section 667.5, subdivision (b) required trial courts to impose a one-year sentence enhancement for each true finding on an allegation that the defendant had served a separate prior prison term, unless the defendant had remained free of both felony convictions and prison or jail custody during a period of five years since the prior prison term.  (Former § 667.5, subd. (b).)  While this appeal was pending, Senate Bill No. 136 went into effect on January 1, 2020.  (Stats 2019, ch. 590, § 1.)  Senate Bill No. 136 amended section 667.5, subdivision (b) by eliminating the one-year prior prison term enhancement, unless the prior prison term was for a sexually violent offense, as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.

It is undisputed that defendant's four prior prison terms for burglary do not qualify as enhancements under the amended version of section 667.5 subdivision (b).  Thus, because defendant's judgment is not yet final, he is entitled to the ameliorative benefit of the change in law.  (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342 [Sen. Bill No. 136 applies retroactively to defendants whose convictions were not final at the time the law became effective].)  Accordingly,  on remand the trial court is directed to strike the enhancements before resentencing defendant.

V

*Alleged Sentencing Error*

Defendant contends the 258 years to life sentence imposed by the trial court must be reversed because it constitutes cruel and unusual punishment in violation of the Eighth

Amendment to the United States Constitution.[14]  According to defendant, his sentence is excessive and serves no valid Legislative purpose.  We disagree.

As an initial matter, we agree with the People  that defendant has forfeited his claim  because, as defendant concedes, he did not raise it in the trial court.  (*People v. Baker* (2018) 20 Cal.App.5th 711, 720; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1247-1248.)  In any event, as we explain below, defendant's claim is without merit.

"[I]t is now firmly established that '[t]he concept of proportionality is central to the Eighth Amendment,' and that '[e]mbodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." [Citation.]' " (*In re Coley* (2012) 55 Cal.4th 524, 538, quoting *Graham v. Florida* (2010) 560 U.S. 48, 59.)  The Eighth Amendment's proportionality principle is narrow in the context of prison terms for adult offenders.  (*In re Bolto*n (2019) 40 Cal.App.5th 611, 622, citing *Ewing v. California* (2003) 538 U.S. 11, 20 (*Ewing*).)  "It ' "does not require strict proportionality between crime and sentence," ' but prohibits ' "extreme sentences that are 'grossly disproportionate' to the crime." [Citation.]' " (*In re Bolton*, at p. 622.)  In determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime, " '[a] court must begin by comparing the gravity of the offense and severity of the sentence. [Citation.]  "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.  [Citation.]  If this comparative analysis "validate[s] an initial judgment that

---

[14]  Because defendant does not raise a contention under the California Constitution's prohibition against cruel and unusual punishment, we limit our analysis to the Eighth Amendment question.

[the] sentence is grossly disproportionate," the sentence is cruel and unusual.' [Citation.]" (*In re Coley*, at p. 542, quoting *Graham*, at p. 60.) "Reviewing courts must ' "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." ' " (*People v. Edwards* (2019) 34 Cal.App.5th 183, 190-191, quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 999 (conc. opn. of Kennedy, J.) & *Solem v. Helm* (1983) 463 U.S. 277, 290.) "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." (*Rummel v. Estelle* (1980) 445 U.S. 263, 272.)

As defendant acknowledges, his current offenses are serious. They arise out of a drive-by shooting involving multiple victims. In arguing that his sentence violates the Eight Amendment's prohibition against cruel and unusual punishment, defendant fails to recognize that he is not subject to a lengthy sentence merely based on his current offenses but also because he is a recidivist with three strike priors. " ' "Recidivism in the commission of multiple felonies poses a manifest danger to society[,] justifying the imposition of longer sentences for subsequent offenses. [Citations.]" [Citation.]' " (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 366.) "Recidivism has long been recognized as a legitimate basis for increased punishment." (*Ewing, supra*, 538 U.S. at p. 25.) "[T]hree strikes sentences for less serious felonies have been routinely upheld against Eighth Amendment attack." (*In re Bolton, supra*, 40 Cal.App.5th at p. 622; see, e.g., *Ewing*, at pp. 28, 30-31 [felony grand theft involving three golf clubs worth approximately $1,200].) Thus, "[i]n weighing the gravity of [defendant's] offense[s], we must place on the scales not only his current felon[ies], but also his long history of felony recidivism." (*Ewing*, at p. 29.) "In imposing a three strikes sentence, the State's interest is not merely punishing the offense of conviction, or the 'triggering' offense: 'It is in addition the interest . . . in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of

society as established by its criminal law.' [Citations.] To give full effect to the State's choice of this legitimate penological goal, our proportionality review of [defendant's] sentence must take that goal into account." (*Ibid.*)

On this record, we cannot say that defendant's sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. The sentence imposed by the trial court is justified by defendant's serious criminal record and the State's public safety interest in incapacitating and deterring recidivist felons. (*Ewing, supra*, 538 U.S. at pp. 29-30.) Defendant, for his part, failed to make a threshold showing of gross disproportionality and made no attempt to engage in the comparative analysis required to validate such a showing. (*In re Coley*, *supra,* 55 Cal.4th at p. 542.)

VI

*Ineffective Assistance of Counsel*

Defendant contends reversal is required because he was denied his right to effective assistance of counsel due to various acts and omissions of his trial counsel. For the reasons we shall explain, we find no ineffective assistance of counsel.

A. *Applicable Legal Principles*

" 'An ineffective assistance claim has two components: A [defendant] must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citations.] Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073.) The reviewing "court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.) To establish prejudice, the defendant must demonstrate there is a reasonable probability that, absent counsel's errors, he would have obtained a more favorable result. (*Id.* at p. 695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Gay,* at p. 1086.)

45

B.  *Hearsay Objection*

Defendant contends his trial counsel was ineffective for successfully objecting to and moving to strike testimony given by a police officer that was critical to his defense of mistaken identity.  We disagree.

Sacramento Police officer Anthony Boler testified that he arrived at the duplex at 7:30 p.m. on September 11, 2017, in response to a report of a shooting.  Upon his arrival, he spoke with and took statements from T. and La.N.  When he was asked what La.N. had said about the shooting at the scene, Boler replied, "[La.N.] told me that he saw a subject that he was told was Markees based on his other friend that was there.  [T.] knew him.  And said that he saw him across the street possibly buying weed or --."  At that point, defense counsel lodged a hearsay objection.  The trial court sustained the objection and granted counsel's request to strike the testimony.

We need not decide whether defense counsel's actions were deficient because defendant suffered no prejudice.  La.N. testified prior to Boler.  During his testimony, La.N. identified defendant as the shooter.  In doing so, he explained that it was daytime when the shooting occurred, and he saw defendant's face at close range moments before the gunshots were fired.  La.N. testified that he told the responding officers that defendant was the shooter after he viewed photographs of defendant on a cell phone, which were shown to him by T. and S.  When asked, La.N. made clear that he recognized defendant as the shooter based on his own observations, not anything T. had said about the identity of the shooter.  Several days after the shooting, La.N. identified defendant from a photographic lineup.  On cross-examination, La.N. confirmed that he saw defendant's face moments before the shooting at close range.  He also acknowledged that T. had "said a name" of the person she believed was the shooter prior to the police arriving, and that he, T., and S. were all talking at the same time when the police

46

arrived.[15]  When Boler was cross-examined, he said that T. identified defendant as the shooter at the scene.  In view of the record, we cannot conclude there is a reasonable probability that, absent the objection by counsel, defendant would have obtained a more favorable result.

C. *Gang Evidence*

Defendant contends his trial counsel was ineffective for failing to object when the prosecutor committed misconduct by eliciting gang-related evidence in violation of a court order, and by eliciting additional gang evidence.  We disagree.

We have already concluded that defendant suffered no prejudice from the prosecutor's alleged misconduct regarding the solicitation of gang-related evidence.  The claim adds an exchange between defense counsel and a detective that involved a text conversation found on defendant's cell phone that occurred about a week before the shooting:

"Q.  And I know you went through each of the pages of this string of text messages.

"But as you went through these, and . . . based on your training and experience, can you kind of figure out what they're talking about in . . . these text messages?

"A.  In this one, yes.

"Q.  What is it?

"A.  Well, when they talk about hurry up, we look stupid trying to trap on a holiday, trap is a common term for selling drugs.  They call them trap houses in gang world, just what I said.

"Trying to trap on a holiday in the first place, how am I going to get da

_____

[15]  On cross-examination, Boler acknowledged that "females," including T. were "chiming in" when La.N. was giving his initial statement at the scene.

without being seen?

"They talk about the car the police flipping on them and those type of messages. They're out there doing something which they refer to as trapping.

"Q. And you don't know who is sending the messages. You just know what phone numbers are going back and forth?

"A. Which phone numbers are sending those messages, correct. Yes.

In view of the compelling evidence against defendant and the brief reference to him possibly being involved in a conversation using gang-related terminology, we do not find there is a reasonable probability that, absent the alleged deficient performance by defense counsel, defendant would have obtained a more favorable result. The text messages, at most, indicate that defendant was familiar with gang terminology and suggest he associated with gang members, but nothing in the conversation shows that he was in a gang or affiliated with a gang. Moreover, as we have noted, the critical issue in this case was the identity of the shooter. Defendant's guilt turned on whether the jury believed the evidence showing that he was the shooter.

D. *Jury Instructions*

Defendant contends that his trial counsel was deficient for a variety of reasons related to jury instructions. However, with one exception that we need not discuss here,[16] we found no error on the merits with respect to defendant's jury instruction contentions or no prejudice from the asserted errors. Defendant's sole remaining claim is that a reasonably competent criminal defense attorney would have requested a limiting instruction as to defendant's April 2017 conduct, and that he was prejudiced because,

---

[16] As set forth above, we have concluded that the instruction on the kill zone theory was erroneous and was prejudicial as to the attempted murder of Z. but not prejudicial as to the attempted murder of S. and La.N. In light of our conclusions, we need not address defendant's related claim that trial counsel was ineffective for failing to object to the kill zone instruction.

48

absent a limiting instruction, the jury was allowed to use that conduct as propensity evidence in violation of Evidence Code section 1101, subdivision (a).  We find no prejudice.

Any error in failing to seek a limiting instruction was harmless given the relatively benign and highly probative nature of the evidence of the April 2017 conflicts, only one of which involved the brief brandishing of a gun, as well as the absence of any argument by the prosecutor urging the jury to infer defendant's propensity to commit the shooting, the presumption that the jurors followed the instructions regarding presumption of innocence and reasonable doubt, and the independent compelling evidence showing that defendant was the perpetrator of the shooting, which we have outlined in detail *ante*.

E.  *Closing Argument*

Defendant contends his trial counsel was ineffective for failing to argue to the jury that, in the event it concluded he was the shooter, he was only guilty of the lesser offenses, including assault with a semiautomatic firearm.  We need not address whether counsel was deficient because defendant has failed to show prejudice.  We have concluded that reversal is required on defendant's conviction for the attempted murder of Z.  We have described in detail the compelling evidence of defendant's guilt as charged related to the attempted murder of S. and La.N.  Argument is not evidence and would not have added either proof or instructions to the information already under consideration by the jury.  On this record, we cannot conclude that, absent the alleged deficiency, defendant would have obtained a more favorable result.[17]

---

[17]  To the extent this claim is based on defense counsel's failure to argue that defendant was, at most, guilty of the lesser included offense of attempted voluntary manslaughter, it fails.  As we explained above, the trial court had no duty to give an instruction on this offense.  It therefore follows that counsel was not deficient for failing to request an instruction on the offense or argue that defendant was guilty of committing the offense.

49

F. *Sentencing*

Defendant contends that his trial counsel was ineffective because he failed to "act as a diligent and conscientious advocate" at sentencing. Specifically, defendant claims that counsel was deficient because he failed to (1) file a motion requesting dismissal of his strike priors and the firearm enhancements, (2) file a sentencing memorandum, (3) argue that defendant's youth should be considered in determining the proper sentence, and (4) object to the lengthy sentence imposed by the trial court on the ground that it constituted cruel and unusual punishment in violation of the Eighth Amendment. We see no prejudice.

A review of the record undermines any claim that there is a reasonable probability that, absent the alleged deficient performance by defense counsel, defendant would have obtained a more favorable result. Having presided over the bifurcated proceeding regarding defendant's prior convictions and having considered the presentence report prepared by the probation department, the trial court was aware that defendant was 22 years old and on parole when he committed the current offenses, and had suffered four prior burglary convictions, three of which were serious felonies that qualified as strikes under the three strikes law. The trial court was also aware of defendant's juvenile record, which included burglary offenses and unsatisfactory performance on probation, and that defendant had engaged in numerous instances of misconduct while incarcerated pending trial in this matter. At sentencing, defense counsel argued for leniency; he asked the trial court to "consider concurrent sentencing" and "striking the five-year prior enhancements." The trial court acknowledged that it had discretion to strike or dismiss the firearm enhancements and the five-year prior serious felony enhancements but decided not to do so in light of defendant's conduct regarding the current offenses and his history. Instead, the court chose to impose the maximum possible sentence, which included consecutive sentences, on the counts it determined were not subject to section

50

654.[18]  In doing so, the court noted that there were multiple victims, and that it was a "miracle" that no one was actually killed by defendant's "highly dangerous" and "highly reckless" actions.  As for the felon in possession of a firearm offense, the court stated that an upper term sentence was warranted because of defendant's prior record, unsatisfactory performance on parole and probation, and the "increasingly dangerous pattern" of his crimes.

Under these circumstances, any arguable error by defense counsel was harmless. The record does not reflect that it is reasonably probable the trial court would have taken the extraordinary step of deeming defendant to be outside the spirit of the three strikes law.  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1382 [because there is a "preference in the Three Strikes law against striking prior convictions," a trial court's decision to do so "should be " ' "extraordinary" ' "].)  Nor does the record reflect that defendant would have received a more favorable sentence had defense counsel requested a lesser sentence in light of his youth or objected to the sentence imposed by the trial court on the ground that it constituted cruel and unusual punishment in violation of the Eighth Amendment.

VII

*Cumulative Error*

Defendant contends that reversal is required due to the cumulative effect of the errors he asserts on appeal.  With one exception, we have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial.  We reach the same conclusion with respect to the cumulative effect of the asserted errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236.)  As our Supreme Court has observed, a defendant is "entitled to a fair trial but not a perfect one."  (*People v.*

---

[18]  As we discuss below, the trial court did not orally impose sentence on the counts it determined were subject to section 654.

51

*Cunningham* (2001) 25 Cal.4th 926, 1009.)  In this case, defendant received a fair trial except as to the count we will reverse.

## VIII

### *Validity of Section 3051*

Defendant was 22 years old when he committed the offenses in this case.  Under section 3051, subdivisions (a) and (b), offenders 25 years of age and younger at the time of their offense are eligible for a youth offender parole hearing after 15, 20, or 25 years in prison, depending on the sentence.  (§ 3051, subds. (a), (b).)  However, section 3051, subdivision (h) provides that certain youth offenders, including those sentenced under the three strikes law, such as defendant, are ineligible for youth offender parole hearings.[19]

Defendant contends this differential treatment violates equal protection principles.  According to defendant, he is similarly situated to youth offenders who were not sentenced pursuant to the three strikes law, and there is no rational basis for the different treatment.  In support of his position, defendant primarily relies on *People v. Edwards, supra,* 34 Cal.App.5th 183, in which the court held section 3051's categorical ineligibility for "One Strike" offenders had no rational basis and violated such offenders' right to equal protection, reasoning that one strike offenders are similarly situated to youths who commit intentional first degree murder who remain eligible for youth offender parole hearings even though their crimes are regarded as more culpable than the violent sex crimes falling within the one strike law.  (*Id*. at pp. 195-199.)  The *Edwards* court concluded the carve out in section 3051, subdivision (h) was unconstitutional on its face, and remanded for the trial court to determine whether the defendants there were afforded

---

[19]  In relevant part, subdivision (h) of section 3051 provides:  "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61 . . . ."

an adequate opportunity to make a record of information relevant to a future youthful offender parole hearing. (*Edwards,* at pp. 199-200.)

We agree with the People that defendant forfeited his equal protection claim by failing to raise it below. (See *Alexander*, *supra*, 49 Cal.4th at p. 880, fn. 14 [equal protection claim forfeited for failing to raise it in the trial court].) In any event, we conclude that the claim fails on the merits. A similar argument to that raised by defendant was recently rejected in *People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1164-1166. We agree with the reasoning in *Wilkes* and follow it here to reject defendant's equal protection claim. In doing so, we agree with *Wilkes* that *Edwards* is distinguishable. (See *Wilkes*, at pp. 1166-1167.)

IX

*Remaining Issues*

Although not mentioned by the People, we note that the trial court erred in failing to impose sentence on counts five through nine and count eleven. At sentencing, the trial court found that section 654 precluded punishment for these counts but did not orally impose sentence and then stay execution of sentence as to each count. "[W]hen a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence . . . ." (*People v. Duff* (2010) 50 Cal.4th 787, 796; see also *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 ["to implement section 654, the trial court must impose sentence on all counts, but stay execution of sentence as necessary to prevent multiple punishment"].) Accordingly, when defendant is resentenced on remand, the trial court shall impose a full-term sentence on each count it determines is subject to section 654 and then stay execution thereof. (See *People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164 [full-term sentence required on counts stayed under § 654].)

## DISPOSITION

The conviction on count three (attempted murder of Z.) is reversed, sentence is vacated, and the matter is remanded for further proceedings consistent with this opinion, including the striking of the prior prison term enhancements.  In all other respects, the judgment is affirmed.

/s/
_____
Duarte, J.

We concur:


/s/
_____
Raye, P. J.



/s/
_____
Mauro, J.